UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DENNIS ESANBOCK,                    CIVIL NO. 17-3702 (SRN/DTS)
BARBARA ESANBOCK,
CHRISTOPHER SPINKS and
KEVIN SWEHLA,                       **REPORT AND RECOMMENDATION**

      Plaintiffs,

v.

WEYERHAEUSER COMPANY,

      Defendant.

---

E. Michelle Drake, Esq. and Joseph Hashmall, Esq., Berger & Montague, P.C., 43 S.E. Main Street, Suite 505, Minneapolis, Minnesota 55414, for Plaintiffs

Mark Mester, Esq., Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 and S. Jamal Faleel, Esq., Blackwell Burke PA, 431 South Seventh Street, Suite 2500, Minneapolis, Minnesota 55415, for Defendant

---

## INTRODUCTION

Defendant Weyerhaeuser Company ("Weyerhaeuser") moves, pursuant to the Federal Arbitration Act, to compel Kevin Swehla ("Swehla"), one of four named plaintiffs in this putative class action, to arbitrate his claims pursuant to a mandatory arbitration provision in a contract between Swehla and his home builder, Mattamy Minneapolis LLC ("Mattamy"). Weyerhaeuser is indisputably entitled to enforce the arbitration provision in that contract, which is broadly worded. The central issue is whether this dispute is one that Swehla agreed to arbitrate. It is not. Consequently, Weyerhaeuser's motion to compel arbitration must be denied.

**FINDINGS OF FACT**

This  putative class action against Weyerhaeuser arises out of allegedly defective and dangerous joists it manufactured and sold for use in home construction.  Complaint, Docket No. 1.  The joists, known as the TJI Joists with Flak Jacket Protection (the "Joists") were or are installed in the putative Class Members' homes.  *Id.* ¶ 1.  Plaintiffs allege that the Joists are defectively designed and manufactured as the Joists' "Flak Jacket" coating emits a formaldehyde-based resin that results in the "off-gassing" of formaldehyde in excess of acceptable levels and causes other serious air quality issues. *Id.* ¶ 4.  Plaintiffs' legal claims include breach of expressed and implied warranties, violation of the Magnuson-Moss Warranty Act, strict liability, negligence, and violations of Minnesota's Unlawful Trade Practices Act and Consumer Fraud Act.  *Id.* ¶¶ 75-187.

Swehla is an individually-named class representative of the putative class.  *Id.* ¶¶ 31-35.  At the time this lawsuit was filed, Swehla was under contract to purchase a home in Carver, Minnesota that was built using the allegedly defective Joists.  *Id.*  ¶ 31. Swehla was set to close on the home on August 9, 2017 but instead the closing was delayed while the builder, Mattamy, replaced the allegedly defective Joists.  *Id.*  ¶ 32. Swehla claims that the delay caused financial and other unspecified harm.  *Id.*  ¶ 33. When Weyerhaeuser learned of the delay in Plaintiff's closing date, it promptly arranged for temporary lodging for Plaintiff, his fiancé, their four children and their cat.  Knight Declaration ¶ 2, Docket No. 38.  Weyerhaeuser also paid for Swehla to extend the interest rate lock on his mortgage.  *Id.*  ¶ 3.  Weyerhaeuser has in total paid in excess of $22,000 to Swehla and/or on his behalf in mitigation of his losses.  *Id.* ¶ 2.  Swehla filed

this action on August 11, 2017, two days after his originally scheduled closing date, but before he actually closed on the home.  Complaint ¶¶ 31-35, Docket No. 1.

Swehla had signed a home purchase agreement ("HPA") with Mattamy on March 20, 2017.  HPA, Docket No. 39-1.  That contract contains two provisions that are central to this motion.  Section 13 of the HPA provides as follows:

> **13.    Dispute Resolution for Disputes Arising Through Closing.**    For any claims brought prior to Closing, the procedures under this **Section 14** shall be the exclusive and mandatory means for resolving all disputes and claims which arise out of or relate in any way to this Contract, the Limited Warranty, the Home, or other disputes by and between the Buyer and Mattamy or any entity affiliated with Mattamy. Notwithstanding, in the event Buyer raises any claim against Mattamy prior to closing **under the Minnesota Statutes Chapter 327A.02 warranty** then the procedures in **Section 15** and not **Section 14** shall apply.

*Id.* ¶ 13 (emphasis in original).  The remainder of Section 13 describes the procedures for resolving disputes, which include an action in a court of competent jurisdiction where the property is located or, if Mattamy elects, in some other venue where Mattamy does business.  *Id.*

Section 14 of the HPA provides as follows:

> **14.    Dispute Resolution For Disputes Arising After Closing.**
> For any claims brought after Closing, or any claims which are subject to the notice requirements of Minnesota Statutes Chapter 327A the procedures under this **Section 15** shall be the exclusive and mandatory means for resolving all disputes and claims arising out of or relating in any way to this Contract, the Limited Warranty, the House, or other disputes by and between the Buyer and Mattamy or any entity affiliated with Mattamy.

*Id.* ¶ 14 (emphasis in original). The remainder of Section 14 specifies that post-closing disputes are subject to a mandatory mediation process followed by mandatory arbitration. *Id.*

On March 20, 2018, Weyerhaeuser moved to compel arbitration of Swehla's claims. Motion to Compel Arbitration, Docket No. 35. The gist of Weyerhaeuser's argument is that Swehla's claims are subject to the mandatory arbitration provision contained in Section 14 of the HPA. Weyerhaeuser arrives at this conclusion through one of two routes.[1] Weyerhaeuser's primary argument is that Section 13 of the HPA, by its express terms (*i.e.,* the reference to dispute resolution "under **this Section 14**") incorporates into Section 13 the mandatory arbitration provision contained in Section 14 of the HPA. That is, Weyerhaeuser argues, a literal reading of Section 13 of the HPA. Alternatively, Weyerhaeuser argues, even if the Court construes Section 13 of the HPA as not applying the mandatory arbitration provision in Section 14 to pre-closing disputes, Swehla's claims are – in substance, if not in form – a post-closing dispute and are subject to the post-closing dispute resolution procedures in Section 14. Either way, according to Weyerhaeuser, all roads lead to arbitration.

Swehla disagrees. First, he argues, because he commenced this action prior to closing on the house, this is a pre-closing dispute, not a post-closing dispute, and is therefore governed by Section 13 of the HPA. Further, Swehla argues, Section 13's reference to "the procedures under this **Section 14**" is an obvious typographical error that Weyerhaeuser cannot use as a fulcrum to compel arbitration of this claim.

---

[1]    At the hearing on this motion, counsel for Weyerhaeuser argued that there were "4 roads" that all lead to arbitration. Tr. 5-10, Docket No. 55. All four paths, however, lead through either Section 13 or Section 14 of the HPA.

## CONCLUSIONS OF LAW

**I.**    **Standard of Review**

Weyerhaeuser has moved to compel arbitration pursuant to the Federal Arbitration Act ("FAA"). Motion, Docket No. 34. Swehla does not dispute the applicability of the FAA to this action. Plaintiff's Br., Docket No. 47. Under the FAA, it is this Court's responsibility to determine whether a valid arbitration agreement exists between the parties and, if so, whether this dispute falls within the scope of that agreement. *Gannon v. Circuit City Stores, Inc.,* 262 F.2d 677, 680 (8th Cir. 2001). The party seeking to compel arbitration must demonstrate both (1) the existence of a valid arbitration agreement; and (2) that the dispute falls within the scope of that agreement. *Broadribb v. Globe Airport Sec. Servs.,* No. 03-1187*,* 2003 WL 22136071, at *2 (D. Minn. Sept. 15, 2003). In conducting this inquiry, the Court applies ordinary state-law contract principles. *Keymer v. Mfg. Recruiters Int'l., Inc.*, 169 F.3d 501, 504 (8th Cir. 1999). The HPA provides that Minnesota law governs its validity, enforcement and interpretation without regard to choice of law principles. HPA ¶ 17(a), Docket No. 39-1. Though the parties have not directly addressed this issue, neither appears to dispute the application of Minnesota law and both sides have relied upon Minnesota law in making their arguments to this Court.

Here neither party disputes that the HPA contains a valid and enforceable arbitration agreement between Swehla and Mattamy. Likewise, and as shown in greater detail below, there is little doubt that Weyerhaeuser can enforce that arbitration agreement against Swehla. The issue before this Court is whether this dispute is one

the parties to the HPA agreed to arbitrate. Resolving that issue depends, in the first instance, upon the construction of Sections 13 and 14 of the HPA.

Weyerhaeuser places great reliance upon the many presumptions under the FAA that favor arbitration. And, indeed, there are such presumptions. The FAA provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; *Security Life Insur. Co. v. SW Reinsurer*, No. 11-1358, 2013 WL 500362, at *5 (D. Minn. Feb. 11, 2013). The FAA requires a "liberal reading of arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Const.*, 460 U.S. 1, n.27 (1983). Any doubts with respect to arbitrability are resolved in favor of arbitration. *See Mitsubishi Motors Corp. v. Soler Chrysler Plymouth*, 473 U.S. 614, 626 (1985). Courts applying Minnesota law recognize that a motion to compel arbitration should be granted unless "it may be said with positive assurance that the arbitration clause is not susceptible of any interpretation that covers the asserted dispute." *Security Life Insur. Co.,* 2013 WL 500362, at *6; *New Life Products v. Hendrickson*, No. 09-3730, 2010 WL 11537436, at *2 (D. Minn. May 28, 2010); *Richert v. Nat'l Arbitration Forum*, No. 09-763, 2009 WL 3297565, at *11 (D. Minn. Oct. 13, 2009).

But, the FAA's policy favoring arbitration is not absolute; it does not operate without regard to the wishes of the contracting parties as to which disputes they choose to arbitrate. *Mastrobuono v. Shearson Lehmann Hutton, Inc.*, 514 U.S. 52, 57 (1995). Thus, the FAA's presumptions favoring arbitration do *not* compel this Court to order arbitration of disputes that are clearly not within the scope of an arbitration provision. The FAA "directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do

so." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).  In this case, as shown below, it can be said with "positive assurance" that Swehla did not agree to arbitrate this dispute.

## II.   The Agreement to Arbitrate

### A.   Validity, Scope and Enforcement of the Arbitration Agreement

As previously noted, Swehla does not dispute the validity of the arbitration clause in Section 14 of the HPA.  Nor does Swehla deny its breadth.  Indeed, as Weyerhaeuser properly asserts, the scope of the arbitration clause is broad.  When it applies, it applies to "any controversy, claim or dispute arising out of or in any way relating to [the HPA]."

In addition, there is little doubt that Weyerhaeuser is entitled to enforce the dispute resolution provisions in the HPA as expressly provided in Sections 13 and 14. Section 13 provides that:

> The provisions of this Section apply not only to Buyer and Mattamy, but also to anyone connected in anyway to Buyer and Mattamy.  For example, these provisions apply to Mattamy's affiliated companies or entities, contractors, subcontractors, sub-subcontractors, material suppliers, employees, officers, agents and representatives. . . . Buyer agrees that any individual claims that Buyer may wish to assert against Mattamy or qualifying agent must also be brought under these dispute resolution procedures.  **Any persons or parties related or associated in any way to Mattamy may also require Buyer to follow these dispute resolution procedures, whether or not they have signed the Contract and regardless of whether Buyer brings action against Mattamy.**

HPA ¶ 13, Docket No. 39-1 (emphasis supplied).

Similarly, Section 14 of the HPA provides that:

> The above provisions regarding alternative dispute resolution … apply not only to Buyer and Mattamy, but also to anyone connected in any way to Buyer and Mattamy. For example, these provisions apply to Mattamy's affiliated companies or entities, contractors, subcontractors, sub-subcontractors, material suppliers, employees, officers, agents and representatives. . . . Buyer agrees that any individual claims that Buyer may wish to assert against the Mattamy [sic] or its qualifying agent must also be brought under these dispute resolution procedures. Buyer agrees that Buyer will not object to Mattamy adding any other parties to the arbitration that Mattamy desires to join in order to fully adjudicate all related disputes. **Any persons or parties related or associated in any way to Mattamy may also require Buyer to follow these dispute resolution procedures whether or not they have signed the Contract and regardless of whether Buyer brings against Mattamy.**

*Id.* ¶ 14 (emphasis supplied).

Under Minnesota law, to be a third-party beneficiary, the contracting parties must intend their contract to benefit that third party. *Hickman v. SAFECO,* 695 N.W. 2d 365, 370 (Minn. 2005). That intent must be apparent from the contract terms or the surrounding circumstances. *See id.* at 370. Courts are generally inclined to find the requisite intent when the contract refers to the third party either by name or by categorical designation. *See Todd County v. Barlow Projects*, No. 04-4218, 2005 WL 1115479, at *11 (D. Minn. May 11, 2005)(Otter Tail County was an intended third-party beneficiary of a contract that referenced "counties"); *Johnson v. Kraus Anderson Const.*, No. A06-207, 2006 WL 3772319, at *6 (Minn. Ct. App. Dec. 20, 2006)("the absence of the third-party's name does not preclude a finding of intent to benefit a third party if the circumstances show otherwise").

Here, the HPA specifically references Mattamy's material suppliers, a category that indisputably includes Weyerhaeuser. Both Sections 13 and 14 expressly allow an affiliated entity (defined to include a material supplier) to enforce the dispute resolution procedures referenced in those sections. Thus, as a third party referenced by the express terms of the HPA's broad dispute resolution provisions, Weyerhaeuser is entitled to enforce compliance with the procedures outlined in Sections 13 and 14 of the HPA. *See Richert,* 2009 WL 3297565, at *9.

Weyerhaeuser is an intended third-party beneficiary of the dispute resolution procedures described in Sections 13 and 14 of the HPA. Weyerhaeuser, as a material supplier of Mattamy, is by express definition in both Sections 13 and 14, an entity "affiliated with Mattamy" and/or a "person[] or party[] related or associated in any way to Mattamy." As such, Weyerhaeuser is entitled to "require [Swehla] to follow [the] dispute resolution procedures [in Sections 13 and 14 despite not having] signed the contract." HPA ¶¶ 13, 14, Docket No. 39-1. Though Swehla does not concede the point, he also does not dispute it. Tr. 34, Docket No. 55.

Weyerhaeuser has also asserted equitable estoppel as a ground on which it can compel Swehla to comply with the dispute resolution procedures in the HPA.[2] Weyerhaeuser's equitable estoppel argument is, in essence, an alternative route by which the Court could, if necessary, find that Weyerhaeuser can compel Swehla to comply with the dispute resolution procedures outlined in Sections 13 and 14 of the

---

[2]     Weyerhaeuser's precise argument is that Swehla is equitably estopped from claiming he is not required to arbitrate the dispute. Weyerhaeuser identified equitable estoppel as one of the four roads leading to arbitration, but, even if applicable, it only gets there through Section 13 or Section 14 of the HPA.

HPA.  Weyerhaeuser Br. 14-22, Docket No. 36.  The gist of Weyerhaeuser's argument is that Swehla's claims necessarily depend upon the HPA.  Tr. 9.  Thus, according to Weyerhaeuser, because Swehla necessarily relies on the HPA as an affirmative basis for his claims against Weyerhaeuser, he is equitably estopped from asserting that he is not bound by that same contract's dispute resolution procedures.

But, Swehla does not assert that Weyerhaeuser is not entitled to invoke the dispute resolution procedures of the HPA.  Tr. 34.  Rather, he argues that even though Weyerhaeuser can invoke those dispute resolution procedures, they do not compel arbitration of this matter.  Stated otherwise, even assuming equitable estoppel applies, it merely prevents Swehla from arguing that Weyerhaeuser cannot enforce the HPA's dispute resolution provisions against him; it does not resolve whether the claim itself is arbitrable under those provisions.  Because the contract's plain language makes Weyerhaeuser a third-party beneficiary to the contract's dispute resolution procedures, and because Swehla does not challenge Weyerhaeuser's right to invoke these procedures, it is unnecessary for the Court to reach the question whether Swehla is equitably estopped from denying Weyerhaeuser's right to invoke those dispute resolution procedures.

In short, the issue before this Court is whether this dispute is subject to mandatory arbitration under Section 14 of the HPA, the resolution of which depends upon interpretation of Sections 13 and 14 of the HPA.

**B.     The Meaning of Section 13 of the HPA**

The interpretation of a contract is a question of law for the Court.  *Quade v. Secura Inc.*, 814 N.W.2d 703, 705 (Minn. 2012).  The Court must construe the contract to effectuate the parties' intent.  *Id.*  In discerning the parties' intent, the Court must do so strictly from the four corners of the agreement, *id.*, giving effect to all terms of the contract and eschewing an interpretation that is unreasonable, absurd or renders portions of the contract superfluous or redundant.  *Employers Mut. Liab. Ins. Co. v. Eagles Lodge*, 165 N.W.2d 554, 556 (Minn. 1969); *Current Tech. Concepts Inc. v. Irie Enterprises*, 530 N.W.2d 539, 543 (Minn. 1995).  If the parties' intent cannot be gleaned from the four corners of the document, the issue becomes one of fact, rather than one of law, which may be resolved by reference to parol evidence.  *Minnesota School Boards Ass'n. Ins. v. Employers Ins. of Wausau,* 331 F.3d 579, 582 (8th Cir. 2003).  The mere fact that the parties may disagree as to the proper interpretation of a contract's language does not mean the contract is ambiguous or that the parties' intent cannot be discerned from the four corners of the agreement itself.

The first question this Court must decide is the meaning of Section 13 of the HPA.  Weyerhaeuser contends that the phrase "[f]or any claims brought prior to closing, the procedures under this **Section 14** shall be the exclusive and mandatory means for resolving [them]," is a clear and unambiguous incorporation into Section 13 of the arbitration procedures delineated in Section 14.   Stated otherwise, Weyerhaeuser contends that the sentence simply means what it says – that the post-closing dispute resolution procedures set forth in Section 14 also apply to pre-closing disputes under Section 13.   To the extent that the post-closing dispute resolution procedures in

Section 14 conflict with the pre-closing dispute resolution procedures in Section 13, (and they do), the Section 14 procedures simply displace the Section 13 procedures.

Swehla disagrees, asserting that "this Section 14" is, on its face, and in the context of the entire HPA, an obvious typographical error that apparently resulted from a mis-numbering: "this Section 14" - contained as it is in paragraph 13 - really means "this Section 13." The Court agrees with Swehla. The reference in Section 13 to "this Section 14" is an obvious typographical error.

There are many reasons why the reference in Section 13 to "this Section 14" is a typographical error that can only reasonably be understood to mean to Section 13. To begin, the phrase "this Section 14" within Section 13 is grammatically awkward, to say the least. More importantly, the entire structure of the HPA would be rendered nonsensical if the court were to construe the reference in paragraph 13 to "this Section 14" in the literal manner urged by Weyerhaeuser. Section 13 contains its own dispute resolution procedures that are distinct from those in Section 14 and that apply to disputes brought before closing on the home.[3] Though Section 13 modifies the ordinary process of litigation, it does not itself mandate arbitration. Section 13 (1) requires that pre-closing claims be resolved by the court; (2) provides that each party pay its own costs and attorneys' fees, (3) includes an explicit waiver of a jury trial, and (4) prohibits

---

[3]     Though many of the provisions in Section 13 and 14 are similar, if not identical, some of those provisions are in direct conflict. For example, Section 14 requires mandatory mediation prior to initiating an action; Section 13 does not. Section 13 requires a court litigation process, while Section 14 only permits a court process if the matter is within the jurisdictional limits of conciliation court. If Section 13 actually required that the procedures in Section 14 were the "exclusive and mandatory means for resolving" pre-closing disputes, the conflicts between the procedures in Section 13 and those in Section 14 could not be reconciled in a principled manner. This would mean that Section 13 conflicts with itself.

the buyer from joining or participating in a class action.  But, if the phrase "this Section 14" in Section 13 in fact refers to Section 14, then the distinct procedures delineated in Section 13 would be superfluous, as the HPA nowhere incorporates or otherwise refers to those Section 13 procedures.[4]  Because, under Weyerhaeuser's reading, the procedures set forth in Section 13 would not expressly apply to any disputes, Weyerhaeuser's interpretation renders Section 13 superfluous to the agreement.  If, however, Swehla's reading of the reference to "this Section 14" is the correct one, then the procedures delineated in significant detail in Section 13 do have relevance because they do govern pre-closing disputes.

There is considerable evidence within the four corners of the HPA establishing that the reference to "this **Section 14**" is, as Swehla describes it, an "obvious typo." That typographical error is repeated so often and in such a consistent manner throughout the HPA as to demonstrate that Swehla's interpretation must be correct.  To begin, Section 12 of the HPA states that in the event of a termination of the contract, "the other party must object to the attempted termination within ten days of receipt of the Termination Notice (which meets the requirements of Section 13(a)(i))."  HPA ¶ 12(a)(ii), Docket 39-1.  This internal reference within Section 12 to the Termination Notice referenced "in Section 13(a)(i)" is an obvious typo.  There is no provision numbered 13(a)(i) in the HPA.  But there is a provision numbered 12(a)(i). The reference to "13(a)(i)" must be a reference to 12(a)(i) because it refers to the "Termination Notice," a

---

[4]    When the HPA does reference Section 13, it provides the most vivid illustration of the problem arising from Weyerhaeuser's desire to read the HPA in a literal fashion that ignores the typographical errors in the Agreement.  If read in the manner Weyerhaeuser puts forth, Section 13(b) would provide that all disputes **not** resolved pursuant to Section 13(b) will be resolved by the procedures set forth in 13(b).  This is nonsensical.

term of art that is exclusively defined and introduced in Section 12(a)(i).  There is no reference in Section 13 to the "Termination Notice."  Therefore, in Section 12, though the internal numbering on its face refers to Section 13, it in fact clearly means to refer to Section 12.

Section 13 of the Agreement continues this error.  First, in the prefatory language in Section 13 it states that claims brought prior to closing are governed by the procedures under "this **Section 14**," except for a specified type of dispute (a warranty claim under Minn. Stat. Chapter 327A.02)) which, if it arises prior to closing is governed by "the procedures in Section 15 and not Section 14."  But this reference is also nonsensical.  There are no dispute resolution procedures in Section 15.  Section 15 contains language regarding regulatory disclosure requirements that relate to, among other things, radon, formaldehyde and other hazardous substances.  By contrasting the "dispute resolution procedures" in Section 15 with the dispute resolution procedures in Section 14, it is clear that Section 13 of the HPA intends to distinguish between pre- and post-closing dispute resolution procedures in successive paragraphs.  However, the numerical reference to Section 15 is obviously wrong, as is the reference to Section 14.  Moreover, as in Section 12, Section 13 also refers to the Notice and Opportunity to Cure defaults "pursuant to Section 13(b)."  *Id.* ¶ 13(b).  However, the Notice and Opportunity to Cure are actually delineated in Section 12(b), not 13(b); (13(b) refers to judicial resolution of disputes not resolved by the Cure procedures in Section 12(b)).  Thus, as with Section 12, the internal references in Section 13 are off by one, and in the same direction:  references to Section 13 refer to what is actually contained in Section 12;

references to Section 14 refer to what is actually contained in Section 13; and references to Section 15 refer to what is actually contained in Section 14.

The typographical error is continued in Section 14 which states that claims brought after closing or claims arising under Minn. Stat. Chapter 327A are resolved pursuant to the procedures under "this **Section 15**."  As previously noted, however, Section 15 does not contain any dispute resolution procedures whatsoever.  Similar references to "this Section 15" also appear in Section 14(b) and 14(j).  Similarly, 14(b)'s and (j)'s reference to dispute resolution procedures in "this Section 15," a section which contains no dispute resolution procedures, is yet again an obvious reference to Section 14.  Moreover, in Section 14(c), the HPA *again* refers to resolving defaults under the procedures in "Section 13(b)," a clear reference to Section 12(b)'s Notice and Opportunity to Cure.[5]  Finally, in Section 14(f), the HPA provides "except as otherwise provided in Section 15(d), Buyer and Mattamy will each be responsible to pay the fees of their own attorney and their costs …."  But Section 15(d) in the HPA does not refer to costs and attorneys' fees, Section 14(d) does; Section 15(d) refers to airport zoning regulations which affect the property.

The typographical error is repeated in Section 16 of the HPA, titled "Notices and Communication."  Section 16(a) provides that "any notice … required or permitted to be given under the Contract must be given in accordance with this **Section 17**."  But

---

[5]    Moreover, Weyerhaeuser's proposed construction of the HPA is internally inconsistent.  Weyerhaeuser asserts that when the phrase "this Section 14" is used in Section 13, it means Section 14.  Yet, when the parallel phrase, "this Section 15" is used in Section 14, it doesn't mean Section 15, it too means Section 14. Weyerhaeuser's inconsistent approach to construing nearly identical phrases in the HPA in opposite ways appears designed to achieve a particular outcome rather than to apply a coherent principle.

Section 17 does not contain any notice procedures.  Rather, the notice requirements are all contained within Section 16.  Again, the internal reference within Section 16 to "this Section 17" obviously refers to Section 16; it is the same error that pervades Sections 12-14.

In short, beginning in Section 12 of the HPA, all internal references to numbered paragraphs are off by one number, and in the same direction (Section 12 refers to itself as "this **Section 13;**" Section 13 refers to Section 12 as "Section 13" and to itself as "this **Section 14;**" Section 14 refers to itself as "this **Section 15**;" and Section 16 refers to itself as "this **Section 17**.")  It is readily apparent that these obvious typographical errors resulted during the drafting process when a numbered section appearing in the HPA above what is the present Section 12 was deleted from the Agreement.  This deletion changed the paragraph numbers but did not change the internal numeric references within each paragraph.  But this Court need not decide how the typographical error occurred; whatever its source and cause, it is obviously just that – an error.[6]

Moreover, when the errors are corrected so that all internal numeric references in paragraphs 12-16 are lowered by 1 (*e.g.,* if all references to "this Section 14" are construed to mean "this Section 13"), the entire HPA and its internal numeric references are logical and coherent.

---

[6]   This error is further evidenced by another typographical error appearing throughout the HPA.   Throughout the HPA there are editorial question marks which were never eliminated, indicating that the drafter was questioning whether a particular provision was properly included and/or worded.  These editorial question marks – "(?)" - appear in Sections 5(f), 7(b), 12(b)(1), 14(b), 15(t) and 17(d).   These pervasive typographical errors in the signed Agreement provide context for understanding that the internal numeric references in Sections 12-16 are the result of sloppy drafting.

Weyerhaeuser, however, raises several arguments against this interpretation of the contract. First, Weyerhaeuser asserts that the reference to "this Section 14" in Section 13 must refer to Section 14 because Section 13 contains several references to arbitration. Since Section 14 is the only section that contains an arbitration provision, Weyerhaeuser argues, it must be that Section 13 meant to incorporate that provision, which it did by its reference to "this Section 14." Tr. 14. However, this argument is plainly wrong and contrary to the express terms of Section 13. Section 13 begins by providing that "notwithstanding [the reference to "this Section 14"] in the event the Buyer raises any claims against Mattamy prior to closing under the Minn. Stat. Chapter 327A.02 warranty, then the procedures in Section 15, and not Section 14, shall apply." In other words, contrary to Weyerhaeuser's assertion, Section 13 does reference arbitration because a narrow class of pre-closing disputes (statutory warranty claims) are an exception to a court-centric dispute resolution process for resolving pre-closing disputes. For this specific subset of pre-closing disputes, Section 13 expressly makes those claims subject to the arbitration provisions contained in Section 14 (erroneously described as Section 15). This is significant in two respects. First, it makes sensible the references within Section 13 to arbitration because certain defined pre-closing disputes are taken out of the procedures in Section 13 and are expressly made subject to arbitration under Section 14. Moreover, the specification that one limited, substantive type of pre-closing claim is not subject to the procedures in Section 13, but to the arbitration provision in Section 14, also expresses the general rule that pre-closing disputes (unless they arise under the statutory warranty provisions of 327A.02) are not subject to arbitration. *Expressio Unius Est Exclusio Alterius.* Therefore, the references

within Section 13 to arbitration actually make it clear that the prefatory language to "this

Section 14" must refer to "this Section 13."

Weyerhaeuser also argues that this Court lacks authority "to reformulate" the

HPA without first permitting discovery on the meaning of the phrase "this Section 14."

Weyerhaeuser asserts that if the Court is inclined to change the plain language of the

HPA, it must allow the parties to conduct discovery and to conduct a mini jury trial on

the issue of the parties' intent with regard to arbitration.  Tr. 9-11.  Referencing the FAA,

Weyerhaeuser argues that the presence of fact questions relating to the arbitration

agreement requires a court to try the issue before proceeding any further on the motion

to compel arbitration.  *See, e.g.,* 9 U.S.C. § 4.  After all, Weyerhaeuser asserts, the

interpretation of an ambiguous contract is a question of fact for a jury.

Weyerhaeuser's critique, though undoubtedly a correct statement of the law,

misses the mark.  The HPA is not ambiguous; nor are the parties' intentions unclear

with respect to arbitration.  To the contrary, there is but one reasonable interpretation of

the HPA.  Accordingly, because the meaning of this contract is clear and the parties'

intent unambiguous, this court is not reforming the HPA, but merely construing it, which

is well within this Court's authority, even in the face of a typographical error.  *See, e.g.,*

*Penncro Assoc., Inc. v. Spring Spectrum L.P.*, No. 04-2549, 2006 WL 1320252, at *10

(D. Kan. May 15, 2006)(holding that because omission of the word "agrees" from the

contract was an obvious typographical error that did not impair "the Court's ability to

ascertain the intent of the parties from the four corners of the contract," the missing

word did not render the contract ambiguous); *Blood & Tissue Ctr. of Central Texas v.*

*Westchester Fire Ins. Co.*, No. A-09-CA-275-55, 2009 WL 10669370, at *5 (W.D. Tex.

June 5, 2009) (holding that exclusion in an insurance contract contained a typographical error that was obvious within the four corners of the contract: "typographical mistakes in a contract . . . yield to the rule that written contracts will be construed according to the intention of the parties, notwithstanding errors and omissions …"); *Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*, 979 F. Supp.2d 206, 213 (S.D.N.Y. 1997)(holding contract unambiguous despite omission of the word "is": "the fact that clarity of language is important in a Himalaya Clause does not mean that a court cannot apply common sense in assessing the parties' intentions. In this case, the omission of the word 'is' appears to have been a mere typographical error."); *Children's Bd. Of Hillsborough Cty. v. Mossaic Network, Inc.,* No. 8:15-cv-1860-T-26MAP, 2016 WL 7423192, at *2 (M.D. Fla. Sept. 2, 2016) (finding that a reference in a building contract to representations and warranties in "Section L" was an evident typographical error that should be read to say "Section N"); *Starr v. Union Pacific R.R. Corp.*, 31 Kan. App.2d 906, 909-10 (Kan. Ct. App. 2001) ("errors in contracts, which do not create such inconsistency that the overall intent of the parties cannot be determined from the four corners of the instrument, do not result in an ambiguous contract but merely create an inconsistency subject to interpretation by the court considering the contract as a whole."); *Brown v. Lang*, 675 P.2d 842 (Kan. 1984) (mere mathematical or typographical error in a contract does not render it ambiguous); *84 Lumber Co. v. F.H. Paschen, et al.,* No. 12-1749, 2017 WL 467679, at *5, (E.D. La. Feb. 3, 2017)(bonds' reference to erroneous date of incorporated subcontract was a mere typographical error that did not create an ambiguity "since the bond clearly identifies the parties to the [sub]contract and . . . guarantees the performance of the Principal . . .. [E]ach provision

in a contract must be interpreted in light of the entire contract as a whole."); *Eldridge v. Poirer*, 50 S.W.2d 888, 891 (Tex. Ct. Civ. App. 1932) (repeated reference in contract to the wrong party did not render contract ambiguous because it "was obvious that the name of Eldridge was erroneously written for that of Mayfield at the three places in the contract.  The doctrine is well established that written contracts will be construed according to the intentions of the parties, notwithstanding errors and omissions, when, by perusing the entire document, the errors can be corrected and omissions supplied, and, to this end, words, names, and phrases misused may be omitted entirely, and words, names, and phrases obviously intended may be supplied."); *Scottsdale Ins. Co. v. Hudson Specialty Ins. Co.,* No. 15-cv-02896-HSG, 2017 WL 1065132, at *fn3 (N.D. Cal. March 21, 2017) ("the Court will not disregard unambiguous language based on inconsequential typographical errors.")   In short, while the interpretation of an ambiguous contract would require discovery and a summary trial, this contract is not rendered ambiguous by the obvious typographical errors described above.

Once the HPA's obvious typographical error is accounted for, the Agreement is internally consistent and coherent: the parties agreed that pre-closing disputes between the Buyer and Mattamy (or an entity affiliated with Mattamy, broadly defined) are subject to defined dispute resolution procedures in court.  This pre-closing dispute resolution process is applied to all pre-closing disputes, with exception for specific statutory warranty claims under Minnesota law.  Those statutory warranty claims, along with post-closing disputes, are subject to the mandatory mediation and arbitration procedures set forth in Section 14.  Accordingly, since the reference in Section 13 to "this Section 14"

can only reasonably be read to mean "this Section 13", pre-closing disputes are not subject to arbitration under Section 14 of the HPA.

### C.    Pre-Closing v. Post-Closing Dispute

Weyerhaeuser argues that even if the Court determines Section 13 does not incorporate the arbitration procedures in Section 14 to apply to pre-closing disputes, Swehla's action is nonetheless subject to arbitration because it is, in substance, a post-closing dispute expressly covered by Section 14.  Because Swehla is seeking monetary damages in this action, Weyerhaeuser asserts this must be construed to be a "post-closing" dispute.  Weyerhaeuser's argument is premised on language in Section 12(c) that limits the remedies in cases of a pre-closing *default* to specific performance.  HPA ¶ 12(c), Docket No. 39-1.

Weyerhaeuser's argument is erroneous because it conflates a pre-closing action for default with all pre-closing disputes.  Moreover, the argument misconstrues the language in Section 12(c)(2) that provides that "if Mattamy defaults … prior to closing, then Buyer, using the dispute resolution procedures specified below, may bring an action against Mattamy for specific performance as buyer's sole remedy."  Thus, Section 12(c) only governs cases of default by Mattamy:  it provides that if *Mattamy* defaults prior to the closing date, Swehla's sole remedy against *Mattamy*[7] is specific performance, *i.e.,* requiring Mattamy to close on the transaction. The provision does not apply to all pre-closing disputes, let alone a pre-closing dispute between Swehla and a material supplier.  Therefore, the fact that Swehla seeks money damages against a

---

[7]    This provision refers only to actions for default against Mattamy and contains no reference to actions against entities associated or affiliated with Mattamy.

material supplier does not transform Swehla's pre-closing claims into a "post-closing" dispute.

Moreover, Weyerhaeuser's argument is directly contrary to the express language of Section 13 which defines pre-closing disputes not by the nature of the relief sought, but strictly by their timing: "any claims brought prior to closing." Therefore, Section 12's reference to the remedy of specific performance merely specifies the remedy a Buyer may obtain in the case of default by Mattamy. It does not alter the definition of "pre-closing dispute" in Section 13, nor does it transform Swehla's claim from a pre-closing dispute to a post-closing dispute.[8]

Weyerhaeuser further argues that Swehla's claim must be a post-closing dispute because Swehla, prior to closing, did not own the allegedly defective Joists in question, and therefore would not have had standing to sue Weyerhaeuser prior to closing. Therefore, Weyerhaeuser insists, this action could only properly have been brought as a post-closing dispute. The Court finds this argument unpersuasive. Prior to closing on the house, Weyerhaeuser's conduct allegedly interfered with and delayed Swehla's ability to close on the home, thereby causing Swehla damage and potentially exposing Swehla to a default claim by Mattamy. Therefore, the theory on which Swehla's claims are premised does not require that Swehla own the Joists in question. Accordingly, because Swehla's claims are not premised on ownership of the Joists, they cannot fairly be deemed – on that rationale – a post-closing dispute.

Finally, Weyerhaeuser argues that this case must be deemed a post-closing dispute because, otherwise, it would reward Swehla for "artfully pleading" his action

---

[8]    Weyerhaeuser's argument is also inconsistent with its alternative argument that the language in Section 13 ("this Section 14") must be read literally.

prior to closing on his house.  In essence, Weyerhaeuser argues, Swehla's pleading is "artful" because he intentionally brought his claim before he closed on the house.  But that is precisely the definition of what a pre-closing dispute is under the HPA.  Section 13 of the HPA expressly defines pre-closing disputes as "any claim **brought** prior to closing."  In a similar vein, Section 14 defines post-closing disputes as any claim "**brought** after closing."  The choice of the word "brought," as distinct from "arising," has significance.  If the action is commenced prior to closing on the house, it is a pre-closing dispute; if the action is commenced after the buyer has closed on the house, it is a post-closing dispute.  By its very language and structure, the HPA permits precisely what Weyerhaeuser describes as artful pleading.  In some circumstances, such as this, the claim holder is empowered to choose between bringing his claim before or after closing.  Weyerhaeuser describes this as "artful pleading," but it is precisely what the plain language of the HPA contemplates and permits.

It is undisputed that Swehla's claim was brought before he closed on the house and is therefore, by definition, a pre-closing dispute governed by Section 13.  Because it is governed by Section 13, and because it is not an action on the statutory warranty under Minn. Stat. Chapter 327A.02, it is subject to the dispute resolution procedures outlined in Section 13.  Under Section 13, the dispute "will be resolved by the Court with jurisdiction where the property is located."  Here, the property is located in Savage, Scott County, Minnesota.  This Court has jurisdiction over the subject matter of the

dispute because there is diversity of citizenship between Swehla and Weyerhaeuser. Therefore, this is a court with jurisdiction where the property is located.[9]

Though Weyerhaeuser would ask this Court to look behind the plain language of the HPA to discern the parties' true intent regarding pre- and post-closing disputes, that is not proper. The HPA is unambiguous with respect to its definition of pre- and post-closing disputes and the Court must apply those definitions to the case at hand. Having done so, it can only determine that Section 13, not Section 14, applies to this dispute and that Weyerhaeuser's motion to compel arbitration must be denied.

### RECOMMENDATION

For the reasons set forth above, IT IS RECOMMENDED THAT that Weyerhaeuser Company's Motion to Compel Arbitration and Dismiss or Stay the Claims of Plaintiff Kevin Swehla [Docket No. 34] be DENIED.


Dated:        July 30, 2018

                              *s/ David T. Schultz*
                              DAVID T. SCHULTZ
                              United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

---

[9]        Implicit in the Court's finding that Section 13 governs this dispute, it appears that Swehla has waived his right to a jury trial and his right to participate in a class action. However, those issues are not presently before this Court and are not resolved by it.